```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF OKLAHOMA

 3
    NICOLAS LOPEZ,                    )
 4                                    )
         Plaintiff,                   )
 5                                    )
    -vs-                              )     No. CIV-2010-584-HE
 6                                    )
    FARMERS INSURANCE COMPANY,        )
 7  INC., and FARMERS INSURANCE       )
    EXCHANGE,                         )
 8                                    )
         Defendants.                  )
 9

10

11                      * * * * *

12        DEPOSITION OF MICHAEL JAMES BERRYMAN

13        TAKEN ON BEHALF OF THE PLAINTIFF

14             IN OKLAHOMA CITY, OKLAHOMA

15                 ON MARCH 8, 2011

16             COMMENCING AT 9:35 A.M.

17                      * * * * *

18  APPEARANCES:

19      MR. KENT R. MCGUIRE, Attorney at Law, of the firm
    WHITE & WEDDLE, 5532 North Western Avenue, Oklahoma City,
20  Oklahoma  73118, (405)858-8899, kent@whiteandweddle.com,
    appearing on behalf of the PLAINTIFF.
21
        MR. GREG D. GIVENS, Attorney at Law, of the EDMONDS
22  COLE LAW FIRM, 7 South Mickey Mantle Drive, Second Floor,
    Oklahoma City, Oklahoma  73104, (405)272-0322,
23  ggivens@edmonds-cole.com, appearing on behalf of the
    DEFENDANTS.
24

25  REPORTED BY:  BETH A. MCGINLEY, CSR, RPR-CP
```

EXHIBIT
B

1       A     Yes.  I am the president and chief executive

2   officer of Berryman Enterprises, Incorporated.

3       Q     And what type of business is Berryman

4   Enterprises?

5       A     Berryman is a construction general contractor.

6   It also provides services to the building industry as a

7   building consultant.

8       Q     What type of construction work does Berryman

9   Enterprises provide?

10      A     Well, in its -- its 32-year history, it's

11  provided a -- quite a number of construction projects that

12  range from medical, dental, schools, churches, government

13  facilities, post offices, restaurant, retail,

14  multi-family, single-family, historical renovations.

15  It's -- it's quite the gamut of experience.

16      Q     It's -- commercial construction would be one of

17  the areas?

18      A     Yes, that's one.

19      Q     Do you build homes, residential homes?

20      A     I -- I have.

21      Q     How many years ago did you build residential

22  homes?

23      A     Oh, I -- from the ground up, I think we built

24  our first house probably in -- somewhere around 1999 or

25  2000.

1      Q      The first house you built was '99 or 2000?

2      A      Yes.

3      Q      When was the last house you built?

4      A      It was completed in approximately 2007.

5      Q      Does your company, Berryman Enterprises,

6   actually provide the construction work?

7      A      Yes.

8      Q      And so does Berryman -- Berryman Enterprises

9   have employees?

10      A      Yes.

11      Q      How many employees?

12      A      Approximately 22 employees.

13      Q      And are these construction workers?

14      A      Yes.  They include some office personnel,

15   project managers, estimators, accounting people, marketing

16   and sales, and, also, field personnel to include

17   superintendents, carpenters and laborers.

18             MR. GIVENS:  Is that somebody's phone?

19             (An off-the-record discussion was had.)

20      Q      (By Mr. McGuire) So you have a total of 22

21   employees.  Is that including you?  Do --

22      A      Yes.

23      Q      -- you consider yourself an employee?  Do you

24   have some people that actually -- laborers or tradesmen

25   who are involved in actual construction?

```
 1        A     Yes.

 2        Q     Okay.  How many employees make up your

 3    construction workers?

 4        A     Oh, let's see.  Approximately 17.

 5        Q     Then in addition to the 17, you have office

 6    administrative employees, marketing, sales, you have some

 7    superintendents, field superintendents?

 8        A     Yes.

 9        Q     Do the superintendents actually provide

10    construction work?

11        A     Yes, they're working superintendents.

12        Q     So are they -- those included in the 17 you

13    mentioned?

14        A     Yes.

15        Q     Okay.  And your last home -- the last home that

16    Berryman Enterprises built was finished in approximately

17    2007?

18        A     Yes.

19        Q     And how many homes did Berryman build in 2007?

20        A     Well, that -- that home was completed, I think,

21    in early 2007, so that would be the only one.

22        Q     That home was started in 2006?

23        A     No, it started in 2005.

24        Q     How many other homes were built by Berryman

25    Enterprises in 2005, 2006 or 2007?
```

1      A     I'm not sure.  That may be the only one.

2      Q     Would you say that Berryman Enterprises'

3  principal construction work involved more commercial type

4  buildings?

5      A     At this point, and in the last, I want to say,

6  five or six years, it's been significantly involved in the

7  insurance restoration market, and so it's involved in the

8  restoration of residential structures that have been

9  damaged by fire, wind, water, other covered perils.

10     Q     So in the last -- well, let's just say this

11 year, 2011.  What type of restoration services has

12 Berryman Enterprises provided?

13     A     Well, off the top of my head, it's been involved

14 in a fire restoration project on an apartment complex in

15 Oklahoma City.  It's also been involved in the roof

16 removal/replacement on a roof system of a commercial

17 building damaged by hail.  It's been involved in a -- the

18 restoration of water damage to a commercial building.

19     Q     Anything else?

20     A     Yes.  There are other projects; I'm just sitting

21 here trying to think of them all.

22           It's been involved in the restoration of a

23 condominium complex in Oklahoma City that was damaged by

24 fire.  It's involved -- involved in a restoration of a

25 commercial warehouse facility that was damaged by

1    collapse.  I think that might be it, but there might be

2    one or two more.

3         Q     That's for this year, 2011?

4         A     Yes.

5         Q     This restoration construction for the apartment

6    complex, that was an apartment complex damaged by fire --

7         A     Yes.

8         Q     -- you say?

9         A     Yes.

10        Q     And so does your company, what, provide a bid to

11   the owner of the complex to restore the property to its

12   prefire condition?

13        A     Yes.

14        Q     Okay.  Do -- and you got that job?

15        A     Yes.

16        Q     Okay.  And are a lot of your jobs bid?  Are you

17   bidding against other contractors?

18        A     Yes.

19        Q     Okay.  This apartment complex, is that owned by

20   a private individual?

21        A     An individual or a group of individuals.

22        Q     Okay.  Are you -- did you offer a bid as a

23   general contractor?

24        A     Yes.

25        Q     And you got the bid.  Is Berryman Enterprises

1   providing the actual work, restoration work, to this

2   apartment complex?

3        A     Yes.

4        Q     So you're using your 17 somewhat employees?

5        A     Yes.

6        Q     Was the fire that damaged the apartment

7   complex -- did it involve the roof of that building?

8        A     Yes.

9        Q     What type of roof was it?

10        A     It was a -- an asphalt composition roof.

11        Q     Does Berryman Enterprises do the work for the

12   roofing restoration?

13        A     Typically, we don't.

14        Q     Do you usually sub that out?

15        A     Yes.

16        Q     The roof for the commercial building that was

17   damaged, that your company is working on, you said that

18   was a commercial building?

19        A     Yes.

20        Q     What type of roof does that have?

21        A     It's known as a single -- single-ply modified

22   bitumen roof system.

23        Q     So a flat roof system?

24        A     Yes.

25        Q     Okay.  And what kind of damage did the roof have

1    in that instance, in that situation?

2        A    Hail damage.

3        Q    What type of hail damage?

4        A    I'm not sure what you mean by that.

5        Q    What -- what type of damage was caused by the

6    hail?

7        A    Oh, how was the roof damaged?

8        Q    Yes, sir.

9        A    It was impact damage, fracture of the membrane

10   and the fiberglass or polyester mats within the single-ply

11   system.

12       Q    And did -- are you the GC on that project?

13       A    Yes.

14       Q    Is there any dispute in that -- concerning that

15   building, between the insurance company, as to what

16   damages were caused by the hail?

17       A    No.

18       Q    You've got another condo where there was a fire.

19   Are you the GC on that job?

20       A    Yes.

21       Q    Did that involve damage to the roof?

22       A    Yes.

23       Q    Okay.  Are -- is Berryman Enterprises involved

24   in the construction or repairs of the roof?

25       A    Only as the general contractor.

1    Q    Who -- who is the subcontractor on that job?

2    A    On the condominium complex?

3    Q    Yes, sir.

4    A    For the roof?

5    Q    Yes.

6    A    Collins Roofing.

7    Q    And what about the roof for the apartment

8    complex that was damaged by fire, who's the subcontractor?

9    A    It's Dub's, D-U-B apostrophe "S."  Dub's Sheet

10   Metal and Roofing.

11   Q    Do you select subs to work on projects, where

12   you are the GC, by soliciting bids?

13   A    Well, yes and no.  We -- we definitely want a

14   price, but we don't -- and so in that sense, we solicit a

15   bid to establish a price before the work starts.  However,

16   we typically don't solicit those prices from just everyone

17   that's in the roofing business.

18   Q    You told me about 2011 back in 20 -- the year

19   2010, 2010.  Did your company also provide construction

20   business -- construction work to buildings that were

21   somehow damaged by certain peril?

22   A    Yes.

23   Q    So your jobs in 2010 would -- would be other

24   buildings, perhaps, where there was fire damage?

25   A    Yes.

1      Q     Maybe other commercial buildings where there was

2   other -- a collapse or some type of damage?

3      A     Yes.

4      Q     Are you -- has Berryman Enterprises ever held

5   itself out as a company that provides roofing -- roofing

6   services to the public?

7      A     Yes.

8      Q     Okay.  Tell me about that.

9      A     I would say, starting in about -- approximately

10   1987, we were heavily involved in providing roof services

11   and that -- that lasted probably through approximately

12   1994.

13      Q     What was the name of your business?

14      A     The same one, Berryman Enterprises.

15      Q     Was it -- was that your principal business

16   during that period of time, '87 to '94?

17      A     No, I wouldn't call -- I wouldn't call it

18   principal, but it was -- it was a significant part of our

19   business volume.

20      Q     And as part of those roofing services, did your

21   company, Berryman Enterprises, replace damaged roofs?

22      A     Yes.

23      Q     And did your company, Berryman Enterprises, tear

24   off damaged roofs?

25      A     Yes.

1      Q      And the work was performed by employees of

2   Berryman Enterprises?

3      A      Some employees and some -- some subcontractors.

4      Q      Well, if you had to do a percentage, how many of

5   the roofing jobs actually involved employees of Berryman

6   actually doing the work versus hiring that work out to

7   subcontractors?

8      A      Well, it's been a long time since I did that

9   but, you know, just sitting here trying to put a

10  percentage on it, I would say maybe somewhere around

11  30 percent with our own forces, 70 percent with

12  subcontractors.

13     Q      And these roofing services that you provided

14  between '87 and '94, were those for the residential and/or

15  commercial industry?

16     A      They -- they were both, but I would say it was

17  more focused on residential and multi-family.

18     Q      Did you, yourself, perform work -- hands-on work

19  on these roofs between '87 and '94?

20     A      Yes.

21     Q      How often were you on the job site, up on the

22  roof, doing the work?

23     A      Oh, I would say I was probably personally

24  present on the job site and involved in the work perhaps

25  five percent of the time.

```
 1        A    Well, I -- I'd already been in the business for,

 2   you know, a number of years, so it wasn't something that

 3   was foreign to me.  I had been around it for a while,

 4   but -- but I also spent time reading manufacturers'

 5   literature on how their particular systems should be

 6   installed in a proper manner.

 7        Q    So you had general knowledge about how a roof is

 8   installed because you had been around the business for a

 9   number of years?

10        A    Yes.

11        Q    And then you read literature from -- are these

12   from manufacturers of roofing material?

13        A    Yes.

14        Q    Did you hire someone who had experience in the

15   roofing industry?

16        A    Yes.

17        Q    Who was that?

18        A    Well, I don't recall their names at this point,

19   but...

20        Q    Did you hire a crew to come in and act as your

21   employees when you began this roofing business in '87?

22        A    What I did was hire selected individuals and

23   basically assembled a crew to do the work.

24        Q    But you hired people who had experience?

25        A    Yes, typically.
```

1     Q     Did you do any roofing work, yourself, back

2     before '87, maybe as a part-time job or summer job or

3     anything like that?

4     A     I had done some roofing with my own hands prior

5     to 1987.

6     Q     What's that mean, "some"?  Tell me.

7     A     Well, I -- I wasn't hired by a company, but I,

8     like, replaced the roof on my mother's house sometime

9     before '87, and did other jobs here and there in roofing

10    prior to 1987.

11    Q     When you say you replaced your mom's roof in --

12    before '87, you did, or did you have employees?

13    A     I might have had an employee up there with me,

14    but I was also up there hammering nails myself.

15    Q     Was that -- did you have your business, Berryman

16    Enterprises, then?

17    A     Yes.

18    Q     What type of roof did you put on your mom's

19    house?

20    A     A three-tab asphalt composition roof.

21    Q     So in the -- as far as it relates to actual

22    roofing experience, you put on your mom's roof -- what

23    year was that?

24    A     I don't remember.

25    Q     Prior to -- that's prior to '87?

1       A    Yes.

2       Q    Sometime prior to '87, you put on your mom's

3    roof, which was an asphalt shingle, and you said you

4    had -- you had helped on some other jobs?

5       A    Yes.

6       Q    A couple other jobs?

7       A    Maybe a half a dozen.

8       Q    Maybe six other jobs?

9       A    From '82 to '87.

10       Q    So from '82 to '87, you helped -- would you --

11    would that be accurate:  You helped others in the

12    installation of roofs?

13       A    Well, I would say I -- I worked with other

14    people to do it.

15       Q    So you worked with other people, between '82 and

16    '87, on approximately six homes?

17       A    As -- as best I can recall.  I mean, you got to

18    realize, that's 25 to 30 years ago.  I'm just going off

19    memory.

20       Q    Okay.  During that '82 to '87 period, did you

21    actually -- did you -- strike that.  Between '82 and '87,

22    were you ever employed by a roofing contractor?

23       A    No.

24       Q    Between this '87 and '94 time period, how did

25    Berryman Enterprises market its roofing services to the

1      Q      Is it 50,000 square feet divided among separate

2    structures?

3      A      Yes, separate structures.

4      Q      Is that all residential structures?

5      A      It's -- I want to say that $50,000 figure -- or

6    50,000-square-foot-figure would apply to residential

7    property, either single-family, duplexes, apartment

8    complexes, condominiums.

9      Q      That involved -- would involve roofs constructed

10    with asphalt and/or wood shake?

11      A      All types of asphalt products and wood shake

12    roofs.

13      Q      You said you were -- Berryman and you were

14    involved in assessing the hail damage.  Does that mean you

15    looked at the roofs --

16      A      Yes.

17      Q      -- on 50,000 square feet of roof?

18      A      Yes.

19      Q      You, yourself, looked at 50,000 square feet of

20    roof?

21      A      I wouldn't say all 50,000, but a significant

22    part of it.

23      Q      And you're talking about the period from '87 to

24    '94?

25      A      Yes.

1      Q     And you did this assessment, or looking at hail

2   damage, as part of Berryman Enterprises' business?

3      A     Yes.

4      Q     What's a -- how much -- I'm trying to picture

5   how many homes.  What's a -- if you got a 3500-square-feet

6   home, how many roofs make up 50,000 square feet?  Probably

7   going to depend on the style and shape of the roof, I

8   suppose.

9      A     Well, you know, I -- I just -- I just realized

10   that I misspoke.  Instead of -- instead of 50,000 --

11   because when you asked me to do that math, I thought, that

12   can't be right.  Instead of 50,000, it's 500,000.  500,000

13   square feet of roofing.  And so that would be the

14   equivalent of somewhere around a hundred and -- of a three

15   thou- -- you want to talk about a 3,000-square-foot

16   structure, then it would be about 167 structures of that

17   size.

18      Q     Let me just -- let me ask it this way:  Between

19   '87 and '94, is it -- is it your testimony that you were

20   involved in looking at hail damaged roofs on asphalt or

21   wood shake shingles of over a hundred homes?

22      A     Well, I'm -- I'm just kind of hung up on what

23   you're calling a home, but -- I mean, the best way for me

24   to say it is -- is that I know that my company and me,

25   personally, were involved in assessing the hail damages on

1    structures where people lived in some sort of arrangement,

2    as a single-family home, a duplex, or in a multi-family

3    situation, that encompassed more than 500,000 square feet

4    of roofing surface and that roofing surface was comprised

5    of asphalt composition shingles and wood roofs.

6        Q    And you're saying you got this -- this business

7    of assessing hail damage by word-of-mouth?

8        A    No, by me soliciting work from individuals that

9    I knew needed a new roof, or most likely needed a new

10   roof, or could need a new roof, or I had heard wanted a

11   new roof, and so I followed up on it and presented our

12   credentials and services and sold the job.

13       Q    And out of those structures that you looked at,

14   did Berryman Enterprises provide the roofing work or was

15   some of it subbed out?

16       A    Berryman Enterprises was responsible for

17   restoring the property, the roof and other items that had

18   been damaged by hail, where hail was an issue, and of that

19   work, approximately 30 percent was provided by our own

20   forces and 70 percent was provided by subcontractors.

21       Q    How many of -- how many -- how much square feet,

22   out of the 500,000 square feet, involved hail damaged

23   roofs?

24       A    I would -- I would say, just sitting here -- I

25   haven't calculated it, but I would say it's in excess of

1    80 percent.

2        Q    And out of the 80 percent, how many of those

3    roofs involved composition?

4        A    That, I couldn't tell you.

5        Q    How many involved wood?

6        A    I -- I couldn't tell you that.

7        Q    Would you say that composition made up a greater

8    part of that -- those roofs?

9        A    Yes, I think that would be accurate.

10       Q    Have you ever received any training -- formal

11   training or education in the recognition of hail and/or

12   wind storms to roofs?

13       A    No.

14       Q    Have you ever received any informal training on

15   the recognition of hail and/or wind damage to roofs?

16       A    How do you define that, "informal training"?

17       Q    Something outside of a classroom, I suppose.

18       A    Yes, I have.

19       Q    Tell me about what type of informal training you

20   have had in the area of damage recognition caused by hail

21   and/or wind.

22       A    Well, I would say that I've had -- I've had

23   three decades of experience dealing with roofing systems

24   in all sorts of different construction settings, all

25   different types of roofing material, and being in and

```
 1   around the industry, having provided the work, getting

 2   quite a bit of experience from that, and also from

 3   research of different manufacturers' products, how they're

 4   to be installed, technical white papers, that a person

 5   could access on the internet, about how shingles are

 6   tested, what their properties are, how to recognize hail

 7   damage, how to repair it, how to price it.

 8       Q    Did you -- is that all during that time period,

 9   '87 to '94, where you did all this research and study and

10   reading up on manufacturers --

11       A    No, I would say that --

12       Q    -- of roofs?

13       A    -- you know, ev- -- everything that I know

14   today, all the knowledge I have and all the experience I

15   have, is really a culmination of about 30 years' worth of

16   dealing with it.

17       Q    But you'll agree that 30 years as a GC doesn't

18   make you an expert as a roofing contractor, does it?

19       A    Just that statement, on a stand-alone basis, the

20   answer would be no.

21       Q    Yeah, I mean, general contracting involves a lot

22   of things that doesn't necessarily have to do anything

23   with the roof of a structure, does it?

24       A    It -- sometimes general contracting doesn't

25   involve roofing.
```

1      Q    Okay.  And that's what I'm -- I'm trying to

2  focus in on, you know, this broad statement that, "I got

3  30 years' experience in the industry, in the general

4  construction industry," doesn't tell me a lot about your

5  experience with roofing, so that's why I'm trying to

6  narrow this down, so I can present it to our Court, on

7  exactly what your background is.  And, you know, you

8  got -- you did some roofing work during -- between '87 and

9  '94, you told me you've looked at or assessed 500,000

10  square feet of asphalt and wood roofs during that period

11  of time.  Can I -- can I ask:  Has your company installed

12  any roofs since 1994?

13      A    When you say "install," does that mean get up

14  there with a hammer and hit the nails or does it mean

15  we're responsible for it?

16      Q    Well, I'd like to know -- yeah, was Berryman

17  Services -- did they actually do the work, yeah, with the

18  hammers, or whatever it takes to install a roof, since

19  1994?

20      A    Yes.

21      Q    How many?

22      A    I don't know.

23      Q    More than five?

24      A    Yes.

25      Q    More than 10?

1       A    Well, I'm not sure because I haven't counted it,

2  but it's probably somewhere from five to 10.

3       Q    None of your current jobs involve repair or

4  replacement of a roof on a residential structure?  Like a

5  home, a family home?

6       A    A single-family home?

7       Q    Single-family home.

8       A    And do you mean right now, in 2011?

9       Q    Yes.

10      A    No, right now, we're not putting a roof on a

11 single-family home.

12      Q    So any -- your -- going back to your training,

13 any informal training is on-the-job training and

14 experience?

15      A    Well, my training and experience stems from the

16 bottom of tearing a roof off with a shovel, to driving the

17 nails, all the way up to interpreting and understanding

18 the science of how roofing materials are constructed and

19 should be put on.  So it really runs the gamut from the

20 bottom to the top.

21      Q    So you've had experience using a shovel, taking

22 off old shingles?

23      A    Yes.

24      Q    And then replacing the old shingles with new

25 shingles?

1        A     Impact damage.

2        Q     Can you tell me how many homes -- let me change

3    the word -- how many asphalt and/or wood roofs you looked

4    at in 2010 for the purpose of assessing whether there was

5    hail and/or wind damage?

6        A     It would be just an approximation on my part,

7    but I would say about a dozen.

8        Q     And out of those dozen, were you asked to look

9    at that damage by property owners and/or insurance

10   companies?

11       A     I think, almost wholly, property owners.

12       Q     Were these homes -- were these asphalt and/or

13   wood shake?

14       A     I'm almost -- I'm almost certain that they were

15   all asphalt composition.

16       Q     What type --

17             MR. GIVENS:  Do the inspection questions include

18   consulting?  I sort of took it that they were still as --

19   nonconsulting, because you haven't been asking about

20   consulting, but I'll stop and --

21             MR. McGUIRE:  Well, my question was -- I don't

22   think I limited it to consulting or nonconsulting.

23       Q     (By Mr. McGuire) My question was:  How many

24   roofs have you been asked to assess whether there was hail

25   and/or wind damage in 2010?  You said about a dozen.

1        A    Well, and I -- and my answer would cover

2   everything that I personally have done as a contractor and

3   a consultant.

4        Q    And these dozen that you told me in 2010 -- I

5   understand that's approximate, you don't have your records

6   here today, but you believe those were all asphalt

7   composition --

8        A    I --

9        Q    -- shingles?

10       A    I think that's right.

11       Q    And what type of -- strike that.  Did you look

12   at any roofs in 2010 that were wood shake or wood shingle?

13       A    Not that I recall.

14       Q    Did you look at any -- strike that.  Let's --

15   let's go to the year before, 2009.  Can you give me an

16   approximation of how many roofs you looked at for the

17   purpose of assessing damage caused by either hail and/or

18   wind.

19       A    It -- it would be more of a guess.  It's just

20   hard to -- it's hard to recall.

21       Q    Can you tell me if you looked at any wood shake

22   or wood shingle roofs in 2009?

23       A    I think that I did.

24       Q    How many?

25       A    Probably six or less.

1     Q     And did you look at those wood roofs for the

2     purpose of seeing if there was hail damage?

3     A     Yes.

4     Q     And out of those six, did you look at those

5     for -- on behalf of a property owner and/or insurance

6     company?

7     A     Prob- -- probably almost wholly insurance

8     companies.

9     Q     So you were -- in those situations, you were

10    retained or hired by an insurance company to go to a

11    property, look at it, tell us whether you think there's

12    hail damage?

13    A     Yes.

14    Q     Okay.  And would that be part of your consulting

15    business?

16    A     Yes.

17        MR. McGUIRE:  Do you want to take a -- how long

18    have we been going?

19        THE REPORTER:  Oh, about 50 minutes.

20        MR. McGUIRE:  50?

21        THE REPORTER:  Yes.

22        MR. McGUIRE:  Want to take a short break?

23        (A recess was had from 10:26 a.m. to 10:34 a.m.)

24    Q     (By Mr. McGuire) Mr. Berryman, have you been

25    retained in the case of Nicolas Lopez versus Farmers

1    places at that time where it had been alleged that

2    interior leakage and damage had occurred, so I viewed

3    those, get an understanding of how extensive -- what it

4    might cost to repair it, and how that related to the

5    alleged damage to the roof caused by hail or wind, and

6    then to look at the claim file materials, as well as

7    depositions of various individuals, to see if I felt like

8    they had used proper technique and protocol in assessing

9    the hail damage that was alleged.

10           And, also, reviewed the depositions of other

11   experts who had given testimony and formed opinions, to

12   see if I agreed with their opinions or disagreed with

13   their opinions, and why.

14   Q     This is a -- do you know that Mr. Lopez has

15   filed a petition alleging that Farmers breached the

16   insurance contract?

17   A     I think that I -- I know that that's part of it.

18   Q     Do you know that Mr. Lopez has alleged that

19   Farmers has breached its duty to deal fairly and act in

20   good faith?

21   A     It's my understanding that's part of the issue,

22   yes.

23   Q     Do you know what that means in the insurance

24   industry, to deal fairly and act in good faith with an

25   insured?

1       A     Not specifically.

2       Q     You're not an insurance adjuster?

3       A     No.

4       Q     You've never worked as an insurance adjuster?

5       A     No.

6       Q     You have no training as an insurance adjuster?

7       A     That's correct.

8       Q     The fact is:  You have no training or experience

9    in the insurance industry; true?

10      A     Well, I have worked in and around the industry

11   as a restoration contractor for 20 years.

12      Q     But you have no experience or training in

13   working in the insurance adjusting field?

14      A     That's correct.

15      Q     Okay.  So how are you qualified, if at all, to

16   address what an insurance company does or does not do?

17      A     Well, to the issue of -- how does any

18   individual -- regardless of their employment, how does any

19   individual approach a roof from a technical standpoint,

20   using the proper protocol to assess hail damage; that, I'm

21   qualified to opine on.

22      Q     You understand the question that ultimately will

23   get decided in this case is whether the insurance company

24   handling this claim acted fairly and reasonably?

25      A     Are you telling me that or asking me that?

1       Q    Do you know that?

2       A    I'm not sure what the questions of fact or law

3    will be in the end.

4       Q    Okay.  You have -- do you -- do you know what

5    claim handling insurance standards are?

6       A    I don't -- I can't say that I can recite them

7    for you or that I've been trained in it, but I -- as I

8    said before, I've been a restoration general contractor

9    for two decades and I've worked in and around the industry

10   so that I have a -- something of an understanding of how

11   the industry works.

12      Q    But did you know, before I brought it up today,

13   that there are standards in the insurance industry that

14   apply to claim handling?

15      A    Yes.

16      Q    Okay.  Can you recite any standard that applies

17   to an insurance company in claim handling?

18      A    No.

19      Q    Do you understand that there are duties that an

20   insurance company owes to its insured that it may not owe

21   to a third party?

22      A    Yes.

23      Q    Okay.  Do you -- do you know what a first party

24   insured is?

25      A    Yes.

1       Q      How -- what?

2       A      The -- the party -- it's my understanding that

3     it's the party that's a part of the insurance contract.

4     Not the insurance carrier, but the other party.

5       Q      Do you know what a third party -- third party

6     claimant is?

7       A      No.

8       Q      Do you know if Mr. Lopez is a third party or

9     first party?

10      A      I'm not sure.

11      Q      Do you know that -- do you know of the insurance

12    claim handling standards as applies to an insurance

13    company's duty to investigate a claim?

14      A      No.

15      Q      Do you know about insurance industry standards

16    as it applies to an insurance company's duty to properly

17    evaluate a claim?

18      A      No.

19      Q      Okay.  The fact is:  We can -- I don't -- rather

20    than going through the list, we can just, you and I, agree

21    today, you're not an insurance claim handling expert and

22    you never have been?

23      A      That's correct.

24      Q      Okay.  Okay.  You are a -- let me ask you this:

25    Do you have any education and training in meteorology?

```
 1        A     No.

 2        Q     Do you have any education, experience or

 3   specialized knowledge with data -- meteorological data

 4   that was obtained and addressed by Ron -- I'm sorry, it's

 5   Ross Dixon?

 6        A     Could you ask that again?

 7        Q     Well, you understand -- you read doc- -- Ross

 8   Dixon's report --

 9        A     Yes.

10        Q     -- as part of your review of this case.  You

11   understand he's a meteorologist?

12        A     Yes.

13        Q     He gathered data or looked at data to formulate

14   his opinions?

15        A     Yes.

16        Q     Okay.  Did you gather any data or -- any

17   meteorological data concerning this case?

18        A     No.

19        Q     Okay.  Do you have any experience or training in

20   doing that type of work?

21        A     No.

22        Q     Okay.  You have a resume or a CV -- I think I

23   have a copy of it.  We can mark this.

24              MR. McGUIRE:  Do you want one, Greg?

25              MR. GIVENS:  I don't.  I think there's one
```

```
1        Q      32, ReMax?

2        A      Yes.

3        Q      33, State Farm?

4        A      That's right.

5        Q      So out of those 33 cases listed or -- on your

6   CV, there were two occasions where you were hired by the

7   plaintiff, and the other times, you were retained by the

8   defendant?

9        A      Well, yes, I believe that's true, except for --

10  I mean, there are cases like 17 and 18 where American

11  Waste was simply a vendor that filed a lien on a property,

12  but the bigger issue was -- Kevin Hinchey was basically

13  a -- became a counter -- counterclaim plaintiff in order

14  to get the owner, Emanuel Edem, to -- to pay him for

15  substantial work that was -- for which he was never paid.

16       Q      Is that Emanuel Edem, the attorney?

17       A      Yes.

18       Q      Have you testified in any other cases since

19  providing this CV?

20       A      Yes, I think one or two.

21       Q      What would those cases be?

22       A      Well, one I know for sure is that, in the last

23  two or three weeks, I've testified in a construction

24  arbitration case in Oklahoma County.

25       Q      Who were -- who hired you in that case?
```

1       A     No.

2       Q     Do you have your -- your file is with you today,

3    right?

4       A     Yes.

5       Q     Let's go ahead and look at that before we get

6    into your report.

7       A     (Handed Mr. McGuire a file).

8       Q     Do I have -- is this your complete file?

9       A     Yes.

10      Q     You have a disk inside the folder.  Do you --

11   what's on that disk?

12      A     Photographs of the Lopez home.

13      Q     Those photographs -- do you understand those are

14   photographs taken by the Farmers adjuster?

15      A     No, I took those photographs.

16      Q     Okay.  You took those photographs when you went

17   to the property?

18      A     Yes.

19      Q     This looks like -- it says 10/08/06?

20      A     That's the -- that's the job file number.

21      Q     Okay.  This is a number you've -- you've

22   associated with this file?

23      A     Yes.

24      Q     Do those numbers have any significance?

25      A     Yes, 10 indicates that the file came in in the

1    year 2010.  The second digit is the month and the third

2    digit is the number -- just chronological order of the

3    file that came in that month.

4         Q    August the 6th, 2010, you were at least

5    contacted by the -- by Greg Givens on this case?

6         A    Well, no, what that means is that it was the

7    sixth file that happened to come in the door during the

8    month of August in 2010.

9         Q    You have a subpoena.  You have some notes.  This

10   stack of documents that I'm going to hand back to you, is

11   that documents that you generated or you have prepared as

12   a result of this assignment?

13        A    Yes.

14        Q    Is that all the documents you have prepared

15   and/or generated with regard to this file, with the

16   exception of this --

17        A    Well, and perhaps there's -- there's prints of

18   the -- my photographs right there.

19        Q    What I -- what I'm trying to do is -- I want to

20   just mark your, I guess, documents you have prepared,

21   notes you have prepared.  Are those in front of you?

22        A    Yes.

23        Q    Okay.  Can we mark that as one exhibit?

24             MR. McGUIRE:  Just mark it as Exhibit 4.

25        Q    (By Mr. McGuire) Okay.  The rest of this file --

```
 1        Q    Is one stronger than the other, or more durable

 2   than the other?

 3        A    In -- how do you define "durable"?

 4        Q    Well, let me just ask it this way:  Does one

 5   last longer than the other, in your opinion?

 6        A    Well, I think -- I think wood -- wood shakes are

 7   going to last longer.  They're thicker.

 8        Q    There's some photographs in your file.  Who took

 9   those?

10        A    I did.

11        Q    Okay.  Are those the pictures that would be on

12   your disk?

13        A    Yes.

14        Q    Let's go ahead and mark those, as well, too.

15   Exhibit 5.

16             MR. McGUIRE:  Greg, do you know if I have this

17   '97?

18             MR. GIVENS:  You do, Kent, because I -- off the

19   record.

20             (An off-the-record discussion was had.)

21        Q    (By Mr. McGuire) All right.  Going on through

22   the file.  There's the deposition of Natalie Merritt.

23   Have you reviewed the deposition?

24        A    Yes.

25        Q    There's some highlighting I see in the
```

```
 1    deposition.  Did you make those highlights?

 2        A    Yes.

 3        Q    There is a meteorologist report by Jeff Haby,

 4    H-A-B-Y.  Where did you get that?

 5        A    I got it from research I did on the internet.

 6        Q    You printed that off the internet?

 7        A    Yes.

 8        Q    Do you -- who's Jeff Haby?

 9        A    He's an expert meteorologist.

10        Q    Do you know him personally?

11        A    No.

12        Q    You just found him on the internet?

13        A    Yes.

14        Q    Do you know his credentials?

15        A    No.

16        Q    Why did you print this off?

17        A    Well, I -- I read the deposition of Mr. Webb,

18    who apparently owned a home in the Remington subdivision

19    that was -- his roof, he says, was damaged by hail and it

20    had to be replaced.  He also said that he -- his car was

21    parked in the driveway, but his car didn't receive any

22    damage.  I also know that it's an issue in this case, as

23    has been opined by the meteorologist, Dixon, that the hail

24    at the Lopez home was most likely -- and he put a

25    91 percent probability on it -- that the hail was 1.75
```

1    inches or greater.

2            I disagree with his conclusions.  I disagree

3    that this home was hit by hail of that size and I think

4    that -- my opinion is corroborated by the fact that

5    Mr. Webb's car was not damaged by the hail that

6    apparently, allegedly, damaged his roof.

7        Q    So you disagree with Mr. Webb's testimony?

8        A    Which part of it?

9        Q    That his hail was -- that -- I guess that his --

10   are you disagreeing that his roof was damaged by hail from

11   the storm?

12       A    I don't know whether it was or wasn't.

13       Q    Are you disagreeing that hail fell at the -- on

14   the Lopez house on this -- from this storm?

15       A    It -- it may have fell from the subject storm.

16       Q    Do you -- can you state, with any degree of

17   certainty, the size and density of the hail that fell on

18   the Lopez house in -- in 2009?

19       A    I can't tell you what size it was or the density

20   of the hail, but it's my opinion that it wasn't sufficient

21   enough to damage the roof.

22       Q    And are -- and your basis for making that

23   statement is what?

24       A    Well, there's several.  One, if you look at the

25   adjuster's photographs, Merritt's photographs, if this

1    roof was hit by hail 1.75 inches or greater, the roof

2    would have been clearly decimated and it's not.

3        Q    Have you done any tests, studies or examinations

4    of roofs this age in similar -- similarity to Mr. Lopez,

5    being impacted by 1.75-inch hail?

6        A    I've seen roofs that have been impacted by hail

7    of that size.

8        Q    What do you mean you've seen roofs?

9        A    I've seen wood roofs that have been hit by hail

10   1.75 inches and greater.

11       Q    How -- tell me about those times.

12       A    What do you want to know about it?

13       Q    Well, you've -- you've seen roofs in the context

14   of your business?

15       A    In the -- in the -- in the context -- yes, in

16   the context of working for Berryman Enterprises.

17       Q    How do you know the hail was 1.75 inches?

18       A    Because people picked it up on the ground and

19   saved it.

20       Q    So did you see the size of the hail?

21       A    Yes.

22       Q    Was it -- had it been stored in the

23   refrigerator?

24       A    I'm not sure where --

25       Q    How had it been stored?

1        A    I don't -- that, I don't know.

2        Q    Was it 1.75 inches when you saw it?

3        A    Yes.

4        Q    Do you know how long after the storm you saw it?

5        A    Within a few days.

6        Q    Do you know if it had -- had gotten smaller, had

7   gone through any shrinking between the time it had fallen

8   and the time you looked at it?

9        A    I don't know that.

10       Q    Was the roof that you looked at similar to the

11  roof of Mr. Lopez?

12       A    Similar in terms that it was a wood shake

13  shingle roof.

14       Q    Was it aged the same as Mr. Lopez's roof?

15       A    That, I'm not sure about.

16       Q    Okay.  Wouldn't the type of damage you

17  experience on a wood roof depend on the size and the

18  density of the hail?

19       A    Well, it depends on a lot of factors, those

20  included.

21       Q    Yeah, but here -- here's my problem -- I guess

22  it's not a problem, but -- you're offering opinions based

23  on meteorology information and you're not a meteorologist,

24  are you?

25       A    Well, I -- I don't think what she said is

1    accurate.

2         Q     Yeah, but that's based on your opinion as a

3    contractor?

4         A     Well, you have a person who says, with a high

5    degree of certainty, that hail of a certain size hit this

6    house.  But when you look at the facts of the case, when

7    you look at the photographs that are available, it shows

8    the opposite.  So I can tell you, based on my experience

9    of what hail damage looks like, and the photographs that I

10   see, the meteorologist is wrong.

11        Q     Okay.  So all the studies that he relies on

12   would be wrong?

13        A     Well --

14        Q     In your -- in your opinion?

15        A     I don't know how he came up with his science,

16   but I can tell you his -- his allegations don't match the

17   facts as you see them at the site.

18        Q     Okay.  Did you do any meteorology studies for

19   this case?

20        A     No.

21        Q     Did you gather any data that -- similar to what

22   doc- -- Mr. Dixon gathered?

23        A     No.

24        Q     Do you have any experience, training or

25   education in meteorology?

1       A     No.

2       Q     Your opinion that Mr. Dixon is wrong is based on

3   your review of photographs taken by the adjuster?

4       A     That's one thing.

5       Q     Okay.  By the way, you never saw Lopez's roof,

6   did you?

7       A     Not the -- not the wood shake roof, no.

8       Q     Yeah, because it had been replaced before you

9   ever got involved, right?

10      A     True.

11      Q     So what you're relying on, totally, as to how it

12  appeared, is the pictures taken by the adjuster?

13      A     No, that's -- that's -- that's not accurate.

14  I'm -- I'm relying on sworn deposition testimony of

15  individuals who were there, who gave an eyewitness

16  account, Ms. Merritt, and, also, Mr. Cagle.  I'm relying

17  on the photographs that were taken.

18      Q     Let's stick with the pictures.  Anything that we

19  have showing what the roof looked like, you're limited to

20  what -- the pictures that were taken by Ms. Merritt, true?

21      A     Those are the only photographs that I know that

22  are available besides the one -- ones that I possess.  I

23  guess there are -- I'm sorry, those are the only ones.

24      Q     There are no other photographs taken of

25  Mr. Lopez's roof, other than those taken by the adjuster,

1     Q     What basis --

2     A     There's so many different slopes to the roof; it

3   would be really bizarre if all hail came down on every

4   slope in a perpendicular fashion.

5     Q     Okay.  You're -- is that an assumption you're

6   making?

7     A     No, I'd call it a logical inference.

8     Q     Is that an inference that a jury could arrive

9   at, as well?

10    A     Well, I -- yeah, I think -- I think -- I think

11  any reasonable-thinking person could realize that hail is

12  not going to come down and hit every slope of this house

13  in a perpendicular fashion.

14    Q     Okay.  And your understanding of this Haag

15  report is that their test did involve a perpendicular

16  path?

17    A     Yes.

18    Q     Okay.  Do you know anything about this VIL

19  density that Mr. Ross talked about?

20    A     Only what I've read in his report.

21    Q     Anything about the -- the -- these maps or

22  diagrams that was attached to his report, Base

23  Reflectivity, Vertically Integrated Liquid or Echo Tops?

24    A     Well, I really -- based on my experience as a

25  contractor and how I've seen hail impact structures, and

1    could answer it.

2        Q    I mean, have you gone to any insurance training

3    sessions?

4        A    No.

5        Q    Have you -- Farmers, for instance, has a

6    university.  Have you ever gone to their university?

7        A    No.

8        Q    They've got a training facility in Kansas.  Have

9    you ever gone to that?

10       A    No.

11       Q    Okay.  So "interface" means you've talked, from

12   time to time, with insurance people?

13       A    No, it means that I've worked in and around

14   those people extensively.  I deal with them every day.

15   I've taught classes to insurance adjusters, as a teacher,

16   on both mold and the assessment of fire damage, how to --

17   and damages to roof -- roofs, for that matter, covered by

18   covered perils.  Winds and hail, what do you look for,

19   how, how do you assess it, how do you photograph it, how

20   do you estimate it?

21       Q    Tell me about the teaching you have provided to

22   adjusters.  Where was this teaching?

23       A    I have taught courses to -- to adjusters for

24   Shelter Insurance Company, for Oklahoma Farm Bureau.  I've

25   taught classes to Oklahoma -- what used to be Oklahoma

1    judge it based on what was seen at the site.

2        Q    Are you attacking Mr. Dixon's data that he used

3    to formulate his opinions?

4        A    No.

5        Q    Do you think a jury is capable of coming to a

6    conclusion there is a nine percent chance that

7    Mr. Lopez -- I'm sorry, Mr. Dixon is -- according to his

8    data, is incorrect, without your testimony?

9        A    Well, I'm not sure, but I think an Oklahoma jury

10   is going to understand tornadic winds, winds and hail, and

11   how one area, one home, can be affected and the one right

12   next door not be affected.  I think people can understand

13   that.  I think most people in Oklahoma County have

14   experienced that firsthand.

15       Q    I mean, that's something that could be common

16   knowledge among people that live in Oklahoma?

17       A    It could be.

18       Q    Okay.  And do you know why a jury would need

19   assistance from an expert to tell them that, or is that

20   something that they could arrive on their own?

21       A    Well, I mean, I'm not -- I'm not sure -- I'm not

22   sure what they could arrive at, but I think it would be

23   very important for a jury to understand that when you use

24   data and science and Doppler radar and other things that

25   they're not going to understand, that at the end of the

1       Q     Okay.  Which brings us back -- we're relying on

2    what Merritt says or what photographs she took.  Are you

3    aware that Ms. Merritt refused to go back for a

4    reinspection, to look at splits that were identified by

5    Mr. Cagle?

6       A     No, I didn't know that.

7       Q     And we don't have those pictures and,

8    unfortunately, Mr. Cagle didn't take any pictures, either.

9    So you've got to rely on the photographs that are

10   available, because you didn't get to see the roof, right?

11      A     I -- I'm really relying on -- yes, the only

12   photographs available and everything that I've read.

13      Q     Okay.  And, I mean, really, I guess the only

14   people that actually saw the roof back at the time of the

15   storm was either Ms. Merritt, Mr. Cagle, perhaps Mr. Webb

16   from a -- from a neighbor's house.  I mean, those three

17   people would have the -- maybe the best perspective on

18   what they actually saw, you think?

19      A     Well, I think I established that in my report,

20   that Dixon, Webb and Luther opine based on premises,

21   assumptions and probabilities.  The most reliable sources

22   for the condition of the roof are Cagle and Merritt.

23      Q     Would you say some of your report, where you're

24   addressing opinions of these others, is really argument?

25   I mean, you're making argument against what they're

```
1    offering, right?

2        A    Well, I -- I feel like it's my duty, as an

3    expert, to examine the opinions of other experts and to

4    point out flaws in their logic, opinions and conclusions.

5        Q    Well, you understand Ms. Luther, for instance,

6    is addressing -- and her sole opinions are addressing the

7    reasonableness of how an insurance company handled a first

8    party claim?

9        A    I --

10       Q    I mean, that's the area of her expertise?

11       A    Well, that's not what she opined about.  She got

12   outside that.  She started talking about how she knows

13   this roof was hit by hail.

14       Q    Based on?

15       A    Based on a premise of Dixon, who I believe is

16   wrong.

17       Q    But what your -- I mean, that's -- your

18   opinion -- what you're trying to offer is argument, that

19   your -- that counsel is going to argue at the end of the

20   case, not just opinion -- you're not just offering

21   opinion, you're trying to argue that these other experts

22   are wrong, "because I disagree with them."  That's --

23   that's what your report is, isn't it?

24       A    Well, part -- part of -- part of the reports

25   that I write, I set forth my own opinions and I also tell
```

1    you what's wrong with other people's opinions because,

2    usually, they conflict, and so I feel like I owe the

3    reader a reconciliation of how I square my opinions with

4    their opinions, since they differ.  And from a technical

5    standpoint, using my experience and expertise, I feel like

6    I'm in a good position to point out the flaws in their

7    opinions and logic.

8         Q    Is this -- your -- this report's final.  Do you

9    have any supplements that you intend to make to this

10   report?

11        A    None, other than, earlier in this deposition, I

12   indicated that I just had an opportunity last night to

13   read Mr. Webb's deposition, where he stated that his car

14   was in the driveway, which is at his home, which is in

15   this neighborhood, which everyone believes was hit by

16   1.75-inch hail, but, yet, his car was not damaged at all.

17   I think that's just one more thing that proves it wasn't

18   1.75-inch hail.

19        Q    Okay.  Do you know how many other homes were

20   damaged from this storm --

21        A    No.

22        Q    -- in that neighborhood?

23        A    No.

24        Q    Okay.  As I understand, Farmers may be producing

25   those claim files that I think will show other homes were